# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: : | |
| : | Case No. 1:17-bk-02900-HWV |
| JOHN W. LAFFERTY, III, and : | |
| CONSTANCE A. LAFFERTY : | |
| : | Chapter 13 |
| Debtor : | |
| : | |
| : | |
| JOHN W. LAFFERTY, III, and : | |
| CONSTANCE A. LAFFERTY : | |
| : | Confirmation of Plan |
| Movant : | 11 U.S.C. §1325 |
| : | |
| EASTERN CONSOLIDATION AND : | |
| DISTRIBUTION SERVICES, INC. : | |
| : | |
| Respondent/Objector : | |

## OPINION

In this case the court considers the request of John W. Lafferty, III and Constance A. Lafferty (the "Debtors") for confirmation of their Chapter 13 Plan (the "Plan") pursuant to § 1325 of Title 11, U.S.C.[1] Eastern Consolidation and Distribution Services, Inc. ("ECDS"), the holder of an allowed unsecured claim, has objected to confirmation of the Plan (the "Objection") on multiple grounds, including an assertion that it fails to commit all the Debtors' projected disposable income to the payment of unsecured claims as required by § 1325(b)(1). ECDS has also objected on grounds that the Plan was not proposed in good faith as required by § 1325(a)(3) and that it is not feasible under § 1325(a)(6).

---

[1] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. §101 et seq. (the "Code")

1

## I. Jurisdiction

This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), 157(b)(2)(A) and (b)(2)(L).

## II. Facts and Procedural History

The Debtors filed a chapter 13 petition on July 13, 2017. They claim to have disclosed all their income on their Statement of Current Monthly Income and Calculation of Commitment Period ("Form 122C-1"). According to the calculations performed on Form 122C-1, the Debtors' disposable income is not determined under § 1325(b)(3) and the applicable commitment period is three years. Consistent with Form 122C-1, the Debtors have proposed a Third Amended Plan with a monthly payment of $1,600.00, which will pay approximately 3% of the value of the allowed unsecured non-priority claims.[2]

ECDS has objected to confirmation of the Plan on multiple grounds, including an assertion that the Plan fails to pay all allowed unsecured claims in full or to submit all the Debtors' projected disposable income received during the applicable commitment period as required by § 1325(b)(1). It is undisputed that the Plan does not pay all allowed unsecured claims in full. Thus, the true basis of this part of the Objection is the assertion that the Plan does not submit all the Debtors' projected disposable income received during the applicable commitment period as required by § 1325(b)(1). ECDS references the Debtors' failure to include certain distributions from a bankrupt entity named Calbat, LLC[3] ("Calbat") in their calculation of projected disposable income as support for their Objection. These distributions

---

[2] Calculation based on this court's reading of the claims register and Plan. Estimation does not account for payment of the Chapter 13 Trustee statutory commission.

[3] Calbat, LLC, a now defunct limited liability company owned entirely by the Debtor, filed a voluntary chapter 7 bankruptcy petition on October 31, 2017 in this court to docket number 1:17-bk-04534.

from Calbat, according to ECDS, were received by the Debtors during the 6-month period immediately preceding the month during which this case was filed (the "Sampling Period")[4] and should therefore have been included in the calculation of the Debtors' current monthly income. Had this been done, argues ECDS, the Debtors' disposable income would be significantly higher and the applicable commitment period in this case would be five years instead of three years. This would significantly increase the monthly plan payment necessary to comply with § 1325(b)(1) and increase the distribution to unsecured creditors. Thus, ECDS argues that the Plan should not be confirmed because it fails to commit all the Debtors' projected disposable income to the payment of unsecured claims as required by § 1325(b)(1).

According to ECDS, the distributions from Calbat that should have been included in the Debtors' calculation of their current monthly income include: (1) a capital gain in the amount of $81,198.00 appearing on line 13 and in Schedule D of the Debtors' 2017 Joint Federal Income Tax Return (the "Capital Gain"); (2) eight distributions between January 27, 2017 and April 5, 2017 totaling $20,612.00 listed by Calbat in response to question four of the Statement of Financial Affairs in its bankruptcy case (the "Insider Distributions"); and (3) various disbursements to unknown payees for unknown purposes totaling $8,603.11 as reflected on Calbat's Belco Community Credit Union Checking Account Statements (the "Belco Statements") for the period beginning March 1, 2017 and ending on October 31, 2017 (the "Belco Distributions" and collectively with the Capital Gain and Insider Distributions, the "Calbat Distributions").

Because of the foregoing, ECDS also asserts that the Plan has not been proposed in good faith as required by § 1325(a)(3). Lastly, ECDS objects to confirmation of the Plan on grounds

---

[4] *See* 11 U.S.C. § 101(10A)(A)(i).

3

Case 1:17-bk-02900-HWV    Doc 75    Filed 12/16/19    Entered 12/16/19 16:36:01    Desc
                         Main Document    Page 3 of 20

of feasibility, claiming that the Debtors will not be able to make all payments under the Plan as required by § 1325(a)(6). A hearing on the Objection was held on August 15, 2019 where arguments were heard. The matter is now ripe for a decision.

### III. Discussion

The question presented here is whether the Plan satisfies the conditions of § 1325(b) and, if so, whether it also meets the conditions of § 1325(a). If the Plan does not satisfy the conditions of § 1325(b), then the court may not confirm the plan over the objection of ECDS and the Objection will be sustained. 11 U.S.C. § 1325(b)(1). Conversely, if the Plan satisfies the conditions of § 1325(b) and it also meets the conditions of § 1325(a), then the court must confirm the plan over the objection of ECDS and the Objection will be overruled. 11 U.S.C. § 1325(a). Finally, if the Plan complies with the conditions of § 1325(b) but does not satisfy each of the conditions of § 1325(a), then the court has discretion to deny confirmation of the Plan or to confirm the Plan over the objection of ECDS. *See In re Szostek*, 886 F.2d 1405, 1411-1412 (3d Cir. 1989). The court begins its analysis by defining and assessing the burden of proof.

    A.    **The Burden of Proof – Confirmation Hearings**

        1.    **Defining the Burden of Proof**

The term "burden of proof" is used to refer to two distinct burdens—the burden of production and the burden of persuasion. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005). The burden of production requires the burdened party to introduce enough evidence to make out a prima facie case or lose summarily. *In re 150 N. St. Assocs. Ltd. P'ship*, 184 B.R. 1, 7 (Bankr. D. Mass. 1995) (citations omitted). The burden of persuasion is the ultimate burden assigned to a party who must prove something to a specified degree of certainty (*e.g.* by a preponderance of the evidence) or lose the issue. *Tech. Licensing Corp. v. Videotek, Inc.*, 545

F.3d 1316, 1326–27 (Fed. Cir. 2008). The general rule is that the plaintiffs bear the risk of failing to prove their claims. *Schaffer*, 546 U.S. at 56.

### 2. Assessing the Burden of Proof

It is well settled that the chapter 13 debtor has the initial burden of production and the final burden of persuasion on all elements of plan confirmation. *See In re Hill*, 268 B.R. 548, 552 (B.A.P. 9th Cir. 2001). It is important to note, however, that Bankruptcy Courts may (and normally do) rely upon the report of the chapter 13 trustee at the confirmation hearing to determine whether the debtor has met those burdens. *In re Hines,* 723 F.2d 333, 334 (3d Cir. 1983). Consequently, if no objection is raised by a creditor at or before the confirmation hearing and the trustee is prepared to execute his report in favor of confirmation, then the court will typically confirm the plan as a matter of course.[5] *In re Fricker*, 116 B.R. 431, 436–37 (Bankr. E.D. Pa. 1990).

On the other hand, if an objection is raised by a creditor at or before the confirmation hearing, then the initial burden of production regarding that objection naturally falls upon the objecting creditor. *Id.* at 438; *see In re Ziegler*, 88 B.R. 67, 69 (Bankr. E.D. Pa. 1988); *In re Fries*, 68 B.R. 676, 685 (Bankr. E.D. Pa. 1986). To satisfy its burden of production, the objecting creditor must articulate a "clear and cognizable objection" to confirmation of the plan or the objection may be overruled. *Fricker*, 116 B.R. at 438. The objecting creditor need not produce a witness to articulate a clear and cognizable objection. *Id*. at 437. To the contrary, the court will consider and may sustain an objection if it appears reasonable even if no factual evidence is produced by the objecting party. *Id*. Of course, the court may overrule such an objection without receiving any factual evidence if such an objection appears frivolous or

---

[5] Subject, of course, to this court's independent responsibility to verify that a chapter 13 plan complies with all applicable provisions of the Code prior to confirmation. *In re Szostek*, 886 F.2d 1405, 1406 (3d Cir. 1989).

unfounded. *Id*. If the objecting creditor meets its initial burden of production, then the debtor, who has the burden of persuasion, is required to make a record to persuade the court to overrule the objection and confirm the plan. *Id*.

**B.     The Standard of Proof**

There is a presumption that the preponderance-of-the-evidence standard applies in civil actions between private litigants unless "particularly important individual interests or rights are at stake." *Grogan v. Garner*, 498 U.S. 279, 286 (1991). The language of § 1325 is silent as to the standard of proof required for confirmation of a plan. This silence is inconsistent with a view that Congress intended a heightened standard of proof to protect particularly important individual interests or rights. *Id.* at 286. It is thus fair to infer that Congress intended the ordinary preponderance standard to govern disputes involving plan confirmation. *Id*. at 288. To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true. *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997). This is the standard of proof that applies here.

In the context of the above principals, the issues presented in this case include whether ECDS has articulated a clear and cognizable objection to confirmation of the Debtors' Plan pursuant to §§ 1325(b)(1), 1325(a)(3), and 1325(a)(6), and if so, whether the Debtors have nonetheless satisfied their burden of persuasion by a preponderance of the evidence. This court finds that ECDS has articulated a clear and cognizable objection to confirmation of the Debtors' Plan pursuant to §§ 1325(b)(1), 1325(a)(3), and 1325(a)(6). Therefore, the court will focus its analysis on whether the Debtors have presented enough evidence to satisfy their burden of persuasion and to overcome the ECDS Objection.

C. The Objections

1. Section 1325(b)(1) Objection

The issue presented here is whether the Plan commits all the Debtors' projected disposable income received during the applicable commitment period to the payment of unsecured claims as required by § 1325(b)(1). This court finds that it does because the Debtors have included income from all sources that they received during the Sampling Period in the calculation of their current monthly income and in their calculation of projected disposable income.

Section 1325(b)(1) generally provides that a bankruptcy court may not approve a plan that has been objected to by the trustee or the holder of an allowed unsecured claim unless the plan pays all allowed unsecured claims in full or, alternatively, it provides that all the debtor's projected disposable income received during the applicable commitment period will be applied to make payments to those unsecured creditors.[6] 11 U.S.C. § 1325(b)(1)(A) and (B). The term "projected disposable income" means "disposable income" multiplied by the "applicable commitment period" and adjusted by the bankruptcy court in exceptional cases for any known or virtually certain changes to a debtor's financial circumstances over the same period. *Hamilton v. Lanning*, 560 U.S. 505, 513 (2010); *see* 11 U.S.C. § 1325(b)(2)-(4). The term "disposable income," in turn, is defined as "current monthly income" received by the debtor, less certain expenses detailed in § 1325(b)(2)(A) and (B). Lastly, the term "current monthly income" is defined as "the average monthly income from all sources" during the Sampling Period. 11 U.S.C. § 101(10A)(A)(i).

---

[6] It is undisputed that the Plan in this case does not propose to pay all allowed unsecured claims in full. Therefore, this court's analysis focuses on the issue of whether the Plan properly commits all the Debtors' "projected disposable income" to the payment of unsecured creditors.

7

In its Objection, ECDS asserts that the Debtors' failure to include the Calbat Distributions in their calculation of current monthly income underreports their disposable income and, by extension, also underreports their projected disposable income. The Debtors respond by arguing that the Calbat Distributions were properly excluded from this calculation. Because their projected disposable income was not underreported, the Debtors argue that their Plan should be confirmed over the Objection of ECDS. The Debtors are correct.

### a. The Capital Gain

The Capital Gain was properly excluded from the Debtors' calculation of current monthly income because it does not qualify as "income" that the Debtors received during the Sampling Period under § 101(10A)(A). This is so because the Capital Gain does not represent a gain or recurrent benefit that the debtor came into possession of or acquired during the Sampling Period.

Recall that the term "current monthly income" is defined as "the average monthly income from all sources that the debtor receives" during the Sampling Period. 11 U.S.C. § 101(10A)(A)(i). Although the meaning of this phrase is plain and unambiguous on its face, the court observes that the word "income" as it is used here means "a gain or recurrent benefit." *Webster's Third New International Dictionary* 1143 (1993); *see Blausey v. U.S. Tr.*, 552 F.3d 1124, 1133 (9th Cir. 2009). Likewise, the word "receives" means "to come into possession of" or "acquire." *Webster's Third New International Dictionary* 1894 (1993). Thus, for the Capital Gain to be includable in the Debtors' calculation of current monthly income, it must qualify as a gain or recurrent benefit that the debtor comes into possession of or acquires. The evidence establishes that it does not.

There is a well-known disadvantage to subchapter S corporation tax status known as "phantom income." *A.W. Chesterton Co. v. Chesterton*, 128 F.3d 1, 3, n.1 (1st Cir. 1997); *In re*

8

*Klayman*, 333 B.R. 695, 703 (Bankr. E.D. Pa. 2005). Phantom income "describes the liability that shareholders in an S corporation face for taxes on their share of the corporation's profits, even if those profits are not distributed to the shareholders as dividends." *A.W. Chesterton Co.*, 128 F.3d at 3; *Klayman,* 333 B.R. at 703. By its very definition, "phantom income" does not represent a gain or recurrent benefit acquired by or coming into the possession of the Debtors. As such, it cannot qualify as income that the Debtors received during the Sampling Period.

The Debtor's testimony as it relates to the Capital Gain perfectly describes this well-known phenomenon. The Debtor testified that he was surprised to see the Capital Gain on his 2017 Federal and State Individual Income Tax Returns ("2017 Tax Returns") because he did not receive such a distribution from Calbat in 2017. Hr'g Tr. 57:5–7; Hr'g Tr. 59:8–12. The Debtor further testified that after calling and meeting with his accountant to discuss the issue, it was his understanding that the Capital Gain was a "line item on a tax document for tax purposes only." Hr'g Tr. 58:19–22. Finally, the Debtor testified that the Capital Gain likely resulted from changing Calbat's tax status under the Internal Revenue Code from "sole proprietor to a Subchapter S" corporation and that this change occurred in 2015 upon the advice of his accountant. Hr'g Tr. 57:17–8. Importantly, the court notes that aside from the Debtors' 2017 Tax returns, ECDS offered no testimony or other evidence directly challenging the Debtor's testimony in this regard.

In its Objection, ECDS argues that the Capital Gain qualifies as income that the Debtors received during the Sampling Period simply because it appears in the Debtors' 2017 Tax Returns. This argument assumes that the appearance of the Capital Gain on these tax forms conclusively establishes that the Debtors came into possession of or acquired a gain from same during the Sampling Period. Such an assumption is not supported by the record. It also ignores

9

the Debtor's credible testimony on this issue and fails to consider any other theory that explains the appearance of the Capital Gain on the Debtors' 2017 Tax Returns, such as the phenomenon described above.

In the absence of persuasive evidence to the contrary, and because the court found the Debtor's testimony on this issue to be credible, this court finds that the Capital Gain likely represents phantom income resulting from changing Calbat's tax status under the Internal Revenue Code from sole proprietor to subchapter S in 2015. This finding resolves all evidentiary conflicts regarding the Capital Gain and the Debtors' decision to exclude it from their calculation of current monthly income. The Capital Gain thus does not qualify as income that the Debtors received during the Sampling Period.

Based upon the foregoing, this court concludes that the Capital Gain was properly excluded from the Debtors' calculation of current monthly income because it does not qualify as income that the Debtors received during the Sampling Period under § 101(10A)(A). The court now turns to the Insider Distributions.

### b. The Insider Distributions

The Insider Distributions were also properly excluded from the Debtors' calculation of current monthly income because they do not qualify as income under § 101(10A)(A). This is so because they are loan repayments and expense reimbursements that do not represent a gain or recurrent benefit that the Debtors came into possession of or acquired during the Sampling Period.

The term "loan repayment" means to "pay back something lent to a borrower for his temporary use on condition that it or its equivalent be returned." *Webster's Third New International Dictionary* 1924, 1326 (1993). The term "expense reimbursement" means "to pay

10

Case 1:17-bk-02900-HWV    Doc 75    Filed 12/16/19    Entered 12/16/19 16:36:01    Desc
Main Document      Page 10 of 20

back someone for a financial outlay or cost." *Webster's Third New International Dictionary* 1914 (reimburse, reimbursement), 800 (expense) (1993). These meanings are entirely inconsistent with the notion of a gain[7] or recurrent benefit, which is the plain meaning of the word income as it is used in § 101(10A)(A). For these reasons, loan repayments and expense reimbursements do not qualify as income under that section and may properly be excluded from the calculation of current monthly income.

Question four of the Statement of Financial Affairs filed by Calbat in connection with its voluntary chapter 7 petition (the "Calbat SOFA") is captioned "Payments or other transfers of property made within 1 year before filing this case that benefitted any insider." The body of the question asks the debtor to: "List payments or transfers, *including expense reimbursements*, made within 1 year before filing this case on *debts owed to an insider* or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,425." ECDS Ex. E, 31 (emphasis added). Calbat responded to these questions by listing fourteen distributions from Calbat to the Debtor, John W. Lafferty, III, totaling $23,836.87. ECDS Ex. E, 32. Only eight of the fourteen distributions (previously defined as the "Insider Distributions") are relevant here as six of them do not fall within the Sampling Period. These Insider Distributions are valued at $20,612.00 in the aggregate, three of which are classified as "Loan Payment," another three of which are classified as "Fuel," and two of which are classified as "Expenses" and "Travel Expenses," respectively.

No testimony was presented to the court explaining or challenging the nature and classification of the Insider Distributions in Calbat's response to question four of its SOFA.

---

[7] Defined as a profit in the form of a sum of money, an acquired asset, or a reduction in liability. *Webster's Third New International Dictionary* 928 (1993).

11

When asked by the court why no such testimony was solicited from the Debtor, counsel for the Debtors responded by stating that the Insider Distributions were "listed as expenses, and I don't really see that there should be any conflict as to whether it was income when it's clearly listed as an expense reimbursement."[8] Hr'g Tr. 83:16–8. The position taken by Debtors' counsel correctly recognizes that expense reimbursements and loan repayments do not represent gains or recurrent benefits when received by a debtor and thus do not qualify as income under § 101(10A)(A). On the other hand, when asked whether the Insider Distributions (and the Belco Distributions) were indeed expense reimbursements as claimed by Calbat and the Debtors, counsel for ECDS responded by stating: "Well, even if it is an expense reimbursement, it is money." Hr'g Tr. 84:1–7. This position fails to recognize the important distinction between expense reimbursements and income.

Aside from general unsubstantiated assertions to the contrary,[9] ECDS has offered no testimony or other evidence directly challenging Calbat's classification of the Insider Distributions as expense reimbursements and loan repayments. ECDS simply asserts that the Insider Distributions qualify as income received by the Debtors during the Sampling Period because they appear in response to question four of the Calbat SOFA. This argument assumes the appearance of the Insider Distributions in response to that question conclusively establishes that the Debtors came into possession of a gain or recurrent benefit from same during the Sampling Period. The court finds this argument incomplete and unconvincing.

---

[8] Though the "expense reimbursements "referenced here are listed by Calbat as "Fuel," "Expenses," and "Travel Expenses," the court recognizes that the body of question 4 invites Calbat to include "expense reimbursements "in its response. Thus, reading the question and its response together in a contextual sense leads to the reasonable inference that the responses to question four classified as "Fuel", "Expenses", and "Travel Expenses" are indeed "expense reimbursements".

[9] When counsel for ECDS was asked why expense reimbursements should be considered income, the same counsel responded by stating: "It was reported as income on his tax returns." Hr'g Tr. 84:8–11. However, ECDS offered no support for this assertion and the court is unable confirm it from the record.

12

In the absence of persuasive evidence to the contrary, and because the court finds Calbat's response to question four on the Calbat SOFA and the Debtors' proffer on this issue to be credible, this court finds that the Insider Distributions represent expense reimbursements and loan payments to the Debtors. This finding resolves all evidentiary conflicts regarding the Insider Distributions and the Debtors' decision to exclude them from their calculation of current monthly income. This is so because expense reimbursements and loan payments do not represent a gain or a recurrent benefit, which is the plain meaning of the word income as it is used in § 101(10A)(A). As such, the Insider Distributions do not qualify as income received by the Debtors under that section.

Based upon the foregoing, this court concludes that the Insider Distributions were properly excluded from the Debtors calculation of current monthly income because they do not qualify as "income" received by the Debtors during the Sampling Period under § 101(10A)(A).

### c. The Belco Distributions

ECDS has not met its initial burden of production as it relates to the Belco Distributions and § 1325(b)(1). This is so because ECDS has failed to articulate a clear and cognizable objection pursuant to § 1325(b)(1) in connection with same. Accordingly, this portion of the Objection will be overruled.

Recall that a creditor objecting to confirmation of a plan pursuant to § 1325(b)(1) has the initial burden of production. *Fricker*, 116 B.R. at 438. To satisfy its burden of production, the objecting creditor must articulate a "clear and cognizable objection" to confirmation of the plan or the objection may be overruled. *Fricker*, 116 B.R. at 438. The court may overrule such an objection without receiving any factual evidence if such an objection appears frivolous or unfounded. *Id*.

In its Objection, ECDS argues that the Belco Distributions qualify as income that the Debtors received during the Sampling Period. In support of this position, ECDS argues that it obtained "certain financial records of Calbat, LLC" confirming that "[v]arious expenditures" and "distributions had been made either directly to or on behalf of Mr. Lafferty." Hr'g Tr. 16:1–7. ECDS also claimed that in addition, the Belco Statements reflect that the Belco Distributions were made "directly to John Lafferty from the way the records appear. That document is part of ECD[S]'s Exhibit N . . . ." Hr'g Tr. 16:7–14. Finally, counsel for ECDS offered the following argument at the Hearing:

> And based on a review of these documents, there are any number of individual entries with amounts, but no payees identified, simply labeled things like expenditure or payment. And in most of these cases, there was no indication as to the purpose of the disbursement, and no records have been received by way of things like ledgers, or vouchers, or supporting documentation that could reasonably lead to a conclusion as the nature, or purpose, or payee with regard to these payments.

Hr'g Tr. 16:15–22.

These arguments fail to articulate a clear and cognizable objection. First, the court is unable to identify the "certain financial records of Calbat" that ECDS claims to have obtained and upon which it bases its argument. The court has examined the Belco Statements (which are the only records specifically referenced by ECDS during its argument) and cannot identify any "payments directly to John Lafferty" as argued by ECDS. Second, ECDS's statement that "based on a review of these documents, there are any number of individual entries with amounts, but no payees identified, simply labeled things like expenditure or payment" is too vague and unclear to qualify as a cogent argument capable of being judicially heard and determined. Hr'g Tr. 16:15–7. A skeletal "argument" that is really nothing more than an assertion does not amount to the articulation of a clear and cognizable objection. *See United States v. Dunkel*, 927

F.2d 955, 956 (7th Cir. 1991) (citing *United States v. Giovannetti,* 919 F.2d 1223, 1230 (7th Cir. 1990)). This is especially true when the objection presents a plethora of other arguments, as is the case here. *Id*.

The next argument advanced by ECDS fares no better. Here ECDS makes the assertion that "in most of these cases, no indication as to the purpose of the disbursement, and no records have been received by way of things like ledgers, or vouchers, or supporting documentation that could reasonably lead to a conclusion as to the nature, or purpose, or payee with regard to these payments." Hr'g Tr. 16:18–22. Asserting the existence of unidentified disbursements to unidentified payees for unknown purposes cannot be interpreted, even under the most generous of readings, as the articulation of a clear and cognizable objection pursuant to § 1325(b)(1).

This court concludes that as the objecting creditor, ECDS has not met its initial burden of production as it relates to the Belco Distributions. This is so because ECDS has failed to articulate a clear and cognizable objection pursuant to § 1325(b)(1) in connection with same. Accordingly, this portion of the Objection regarding the Belco Distributions will be overruled.

### 2. Good Faith, or Lack Thereof Pursuant to § 1325(a)(3)

ECDS has also objected on grounds that the Plan was not proposed in good faith as required by § 1325(a)(3). This objection is based primarily upon the Debtors' failure to include the Calbat Distributions in their calculation of "current monthly income," which has already been considered and rejected by the court. ECDS did advance other arguments in support of its assertion that the Plan was not filed in good faith. However, those additional arguments were not well defined or capable of being fully understood. Even if that were not the case, based upon the totality of the circumstances this court finds that the Debtors have met their burden of persuasion on this issue and the Objection based upon a lack of good faith will be overruled.

15

Bankruptcy courts in this circuit, when determining whether a Chapter 13 plan was proposed in good faith, apply a case-by-case, totality-of-the-circumstances analysis that considers the following non-exhaustive list of factors: (1) the nature of the debt; (2) the timing of the petition; (3) how the debt arose; (4) the debtor's motive in filing the petition; (5) how the debtor's actions affected creditors; (6) the debtor's treatment of creditors both before and after the petition was filed; and (7) whether the debtor has been forthcoming with the bankruptcy court and the creditors. *Hackerman v. Demeza*, 576 B.R. 472, 479 (M.D. Pa. 2017) (*citing In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007) (*quoting In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996))) (additional citations omitted).

The Debtors, primarily through the testimony of Mr. Lafferty, have addressed each of the above factors to the satisfaction of this court. For instance, Mr. Lafferty testified that the nature of the debt is mostly business debt with some personal debt, both of which arose out of a need to subsidize business and basic living expenses. Hr'g Tr. 46:7–25. He also testified that the timing of the petition and the motive for filing it relates to a combination of the loss of the Debtors' business, Mr. Lafferty's health situation, a judgment obtained by ECDS in May of 2017, and the entry of tax liens by the United States Department of Treasury, Internal Revenue Service ("IRS") in 2015 and the Pennsylvania Department of Revenue ("Revenue") in 2016 and 2017. Hr'g Tr. 49:21–5; 50:1–25. Mr. Lafferty further stated that no new accounts were opened during the year preceding the filing of the petition in this bankruptcy case, and there were no luxury purchases made during that time period. Hr'g Tr. 47:1–14. He also testified that the Debtors' pre-petition treatment of the IRS and Revenue included the negotiation of payment plans followed by the attempt to honor those payment plans. Hr'g Tr. 49:8–17. According to Mr. Lafferty, the Debtors have remained current with their tax reporting requirements. Hr.'g Tr. 49:17–9. He

16

also testified to the Debtors' treatment of the IRS and Revenue under the Plan, which includes an attempt to pay all allowed priority tax claims over the term of the Plan in accordance with § 1322(a)(2). To accomplish this, the Debtors propose to pay a monthly payment of $1,600.00, which represents a significant portion of the Debtors' monthly income. Finally, based upon the record as developed at the Hearing, this court has no reason to believe that the Debtors have not been entirely forthcoming with the court and with their creditors.

None of the above factors support a finding that the Plan was not proposed in good faith and the record lacks any persuasive evidence to the contrary. The evidence therefore preponderates heavily in favor of a finding that the Plan was filed in good faith.

ECDS's Objection that the Plan was not filed in good faith is based primarily upon the Debtors' failure to include the Calbat Distributions in their calculation of current monthly income, which has already been considered and rejected by the court. To the extent that ECDS advanced other arguments based upon a lack of good faith, the court finds that those arguments do not articulate a clear and cognizable objection capable of being judicially heard and determined. Even if that were not the case, however, based upon the totality of the circumstances this court finds that the Debtors have met their burden of persuasion on this issue and the ECDS Objection based upon a lack of good faith will be overruled.

### 3. Feasibility Pursuant to § 1325(a)(6)

ECDS argues that the Plan fails to comply with § 1325(a)(6), commonly referred to as the feasibility requirement, meaning that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(6). To be feasible, the plan must have a reasonable likelihood of success as determined by the particular circumstances of the plan and the case. *See In re Soppick,* 516 B.R. 733, 748 (Bankr. E.D. Pa. 2014) (collecting cases). "While

the feasibility requirement is not rigorous, the plan proponent must, at minimum, demonstrate that the Debtor's income exceeds expenses by an amount sufficient to make the payments proposed by the plan." *In re Bernardes,* 267 B.R. 690, 695 (Bankr. D.N.J. 2001) (internal citation omitted). "The Bankruptcy Court should be satisfied that the debtor has the present as well as the future financial capacity to comply with the terms of the plan." *In re Eckert,* 485 B.R. 77, 85 (Bankr. M.D. Pa. 2013).

The evidentiary record shows that in addition to monthly Social Security income in the amount of $2,745.00, the Debtors receive another $4,000.00 in rental income each month from a lease with their son, Timothy W. Lafferty, for use in his business Moti Logistics, LLC ("Lessee"). Debtor's Exs. 5, 6, and 8. Against this income the Debtors schedule monthly expenses of $5,515.29, according to the most recently amended Schedule J. ECF No. 50. This leaves only $1,229.71 available to make their monthly plan payment of $1,600.00. However, at the Hearing the Debtor testified that he has never missed a chapter 13 plan payment or been late with a plan payment to the Trustee during the 24 months that he has been in this bankruptcy proceeding. Hr'g Tr. 53:7–16. A payment history provided by the chapter 13 trustee confirms this. Debtor's Ex. 4. The Debtor also credibly testified he had no reason to be concerned with the stability or dependability of the lease payments moving forward. Hr'g Tr. 53:1–6. Accordingly, the evidence establishes the Debtors' ability to make the payments required under the Plan, even if their schedules do not demonstrate this. No evidence was introduced by ECDS to the contrary.

Notwithstanding the foregoing, this court cannot presently find that the Debtors have the financial capacity to comply with the terms of the Plan. This is so because the Debtors have not demonstrated on their schedules that their income exceeds their expenses by an amount sufficient

18

to make all payments proposed by the Plan. Although the feasibility requirement is not rigorous, the Debtors must, at minimum, meet this condition. If this condition had been met, then the Plan would be feasible under the standard set forth above. This is so because the record demonstrates a near perfect payment history under this Plan and all prior plans. It also establishes stable sources of income moving forward. Because of these findings, the court concludes that the Plan would be feasible but for the Debtors' failure to demonstrate on their schedules that their income exceeds their expenses by an amount sufficient to make all payments proposed by the Plan.

In view of the foregoing, the court will provide the Debtors with fourteen days to amend their schedules to demonstrate the ability to make the payments proposed by the Plan. The ruling on the Objection as to feasibility will be held in abeyance until the next confirmation hearing and will be addressed at that time.

### IV. Conclusion

The Plan commits all the Debtors' projected disposable income received during the applicable commitment period to the payment of unsecured claims as required by § 1325(b)(1). This is so because the Debtors have included income from all sources that they received during the Sampling Period in the calculation of their current monthly income and thus, by extension, in their calculation of projected disposable income. The Objection to confirmation of the Plan for failure to comply with 11 U.S.C. § 1325(b)(1) must therefore be overruled.

ECDS's Objection that the Plan was not filed in good faith is based primarily upon the Debtors' failure to include the Calbat Distributions in their calculation of current monthly income, which has already been considered and rejected by the court. To the extent that ECDS advanced other arguments based upon a lack of good faith, the court finds that those arguments do not articulate a clear and cognizable objection. Even if that were not the case, however, based

19

upon the totality of the circumstances this court finds that the Debtors have met their burden of persuasion on this issue. The Objection to confirmation of the Plan for failure to comply with 11 U.S.C. § 1325(a)(3) must therefore be overruled.

Regarding ECDS's Objection that the Plan is not feasible pursuant to 11 U.S.C. § 1325(a)(6), this court concludes that the Plan would be feasible but for the Debtors' failure to demonstrate on their schedules that their income exceeds their expenses by an amount sufficient to make all payments proposed by the Plan. The court will provide the Debtors with fourteen days to amend their schedules to demonstrate the ability to make the payments proposed by the Plan. The ruling on the Objection as to feasibility will be held in abeyance until the next confirmation hearing and will be addressed at that time.

An appropriate Order will follow.

Dated: December 16, 2019

By the Court,

_____
Henry W. Van Eck, Bankruptcy Judge (JH)

20

Case 1:17-bk-02900-HWV    Doc 75    Filed 12/16/19    Entered 12/16/19 16:36:01    Desc
Main Document      Page 20 of 20